UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 15-10398-WGY |
| | ) | |
| | ) | |
| JAMES FRANCIS CONNOR V, | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM OF THE
DEFENDANT JAMES FRANCIS CONNOR V**

The defendant James F. Connor, V is scheduled to be sentenced on April 7, 2016. In light of the Supreme Court's decisions in United States v .Booker, 543 U.S. 220, 125 S. Ct. 738 (2005); Kimbrough v. United States, 552 U.S. 85 (2007), and Gall v. United States, 552 U.S. 38 (2007), it will be the Court's duty, at that time, to impose the sentence which is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to fulfill the purposes of sentencing listed under § 3553 (a)(2). Booker, 543 U.S. at 259-60. Section 3553(a) identifies the purposes of sentencing:

(a) provide just punishment for the offense;

(b) afford adequate deterrence to criminal conduct;

(c) protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed medical care or other correctional treatment in the most effective manner.

For the reasons discussed in this memorandum, the following sentence is more than sufficient to satisfy the factors set forth in § 3553(a):

1) 27 days of federal detention, deemed served. Home incarceration for an additional 4 months with GPS location monitoring at the defendant's expense;

2) Supervised Probation for 2 years;

3) No travel to Massachusetts for the period of probation;

4) No contact with the victim, directly or indirectly, or any person associated with the victim, including the victim's family, friends, associates, or anyone known to you through the victim;

5) Continued participation in mental health treatment as directed and comply with all the rules of the program.  Sign all necessary releases of information to facilitate proof and contact between the provider and the Probation Office.

6) 150 hours of community service.

THE NATURE OF THEIR RELATIONSHIP AND MR. CONNOR'S CONDUCT

James Connor and the victim both met when they were teenagers through the online social networking website, Tumblr in 2012.  Their relationship was unique and conducted entirely online as the two never actually met in person at any time.  When they did meet online the Defendant states that they were both in a vulnerable state as the victim was dealing with a broken relationship and was previously cutting herself.  At the time, Mr. Connor was suffering from depression, suicidal thoughts and cutting.  The two created a bond and their relationship began with long conversations over a significant period of time and this helped them to work through their individual problems.  They developed a sort of pact to help each other and over time the nature of their relationship developed into an unconventional romance.  Through their communication, Mr. Connor and the victim became emotionally close and they frequently engaged in consensual sexual related activities via various online applications such as Snapchat and Facetime which allowed them to exchange photos and videos of themselves.  The victim sent nude photos to the defendant using Snapchat and they both engaged in masturbation through Facetime.  During their relationship they also communicated via telephone, email, Twitter and another messenger service.

Mr. Connor and the victim continued in their relationship in this way until approximately the summer of 2015 when the victim decided to end their relationship by telling him that she no longer wanted him in her life.  This news had a devastating effect on Mr. Connor who had developed deep affection for the victim and he hoped that they would eventually have a life together.  Unfortunately, Mr. Connor, who was nineteen years old at the time of his arrest and a college student, was unprepared to deal with her decision and did not possess the skills necessary to move on from the relationship and the rejection.  Specifically, through therapy and counseling he now recognizes that he was very insecure, suffering from low self-esteem and unable to deal with the ending of the relationship.  At first, he

begged and pleaded with the victim not to end the relationship. When this did not work, he engaged in the activities outlined in detail in the statement of facts submitted by the United States Attorney's Office and the Affidavit in Support of Criminal Complaint and Arrest Warrant filed by FBI Special Agent Brendan C. Fogerty which I summarize and describe herein.

Although Mr. Connor threatened the victim to release sexually explicit images of her to others and publicly post them on the internet, he never actually intended to do so and, in fact, did not follow through with any of his threats. Despite Mr. Connor threatening the victim over a period of time that he would commit suicide if she did not contact him or comply with his demands, he issued a hollow threat of a jilted teenager infatuated with a victim he thought he could persuade with phony pictures of self-harm using fake blood to gain sympathy and continued contact. Although he threatened to hurt the victim, himself and others, Mr. Connor never traveled to Massachusetts and never took any steps to follow through on his threats of physical harm to anyone. He never left his home state of Pennsylvania.

In response to all of this, the victim would ignore Mr. Connor's threats, phone calls and attempts to contact her through social media. Out of desperation, Mr. Connor then resorted to using special internet phone numbers and text messaging application to disguise his identity in an attempt to make contact with her and continue their relationship in a way that he thought would work. When this failed, Mr. Connor was unwilling and unable to extricate himself from this situation and he continued to engage in threats of self-harm and harassment and issued threats of harm to the victim in order to get her to contact him. Mr. Connor never followed through on these threats.

In order to stop Mr. Connor from harassing and threatening her the victim agreed to provide him with sexually explicit images and videos which he preserved but never disseminated. Although the victim related that the defendant threatened to rape her, Mr. Connor denies this allegation and the government found no independent corroboration of this statement. In an effort to end Mr. Connor's tormenting behavior, the victim told him that she was in another relationship with someone else. Mr. Connor became very jealous and responded to this statement by threatening again to hurt her, damage her reputation and publicly disseminate the sexually explicit images of her. He never followed through with these threats and held on to a belief that there was a chance for their relationship to survive.

After the victim ended the relationship in the summer of 2015 and during the time of Mr. Connor's threats and harassment, the police were not notified by the victim and the authorities did not become involved until September 25, 2015. At that time, the victim told Mr. Connor that she was going to seek help from law enforcement because he was lying and manipulating her and would not delete the images that she had previously sent to him that he promised to destroy. Mr. Connor continued to hold

3

on to them and did prove to the victim that he still possessed them by showing them to her in an effort to keep their dialogue going and re-open the lines of communication between them. In late September 2015, he direct messaged three of the victim's Twitter followers and told that that he had pictures confirming that she was cheating on her new boyfriend with him. Those messaged included the victim's 15-year-old cousin; a male from the victim's high school class, with whom the victim had had no recent contact; and a male from the university where the victim attended school.  He never disseminated photos to them.  Before his arrest in Pennsylvania, using a ruse, the victim told Mr. Connor that she contacted her parents and an attorney on the next day in order to get him to stop his ongoing behavior. Yet, Mr. Connor ignored this and believed that he could persuade her to continue with their relationship.  Unfortunately, these threats continued over the remaining few days before the police got involved.   The nature of the case changed dramatically, however, for Mr. Connor and the victim when she was interviewed by FBI Special Agent Fogerty.  A few days later, James Connor was arrested by authorities on October 1, 2015 while on the way to his college classes at Delaware Community College and it all ended.  After his arrest life, as Mr. Connor knew it, was turned upside down as he was delivered a swift and jarring dose of reality related to the consequences of this behavior.

<u>THE ARREST AND DETENTION OF THE DEFENDANT</u>

At the time of his arrest, James Connor was only nineteen years old.  He resided at the family home at 118 Penn Lane, Westchester, Pennsylvania and lived with his parents James and Debra Connor and his sister, Taylor, age 18.   He was arrested by the FBI while on his way to attend his college classes. At the time of his arrest, Mr. Connor was also employed as a shift supervisor at a local drug store in addition to working at his father's company as a mechanical assembler.  He resided in Pennsylvania with his family his entire life.  His family, schooling, church life, and employment were all situated there and made up his entire universe.  His arrest and subsequent detention that day had a shocking and traumatic impact on Mr. Connor and his family.  Mr. Connor had never been arrested before or lived away from his family and there was a period of time when the family was unaware of Mr. Connor's location while he was being transported which was very distressing to them.  The nature of the charges also strained the relationship he previously enjoyed with his sister who was very upset because of them.

After he consulted with his defense attorney at the United States District Court in Pennsylvania, the Unites States Attorney's Office knew from the very outset that they had before them a young defendant who admitted his wrong-doing and who would plead guilty and save the Government the time and expense of a lengthy investigation and trial.  After his detention from the Unites States District Court in Pennsylvania, Mr. Connor was transferred through the system from different detention facilities

a period of a few days until he reached Rhode Island and he was held in custody at the Donald W. Wyatt Detention Facility.   Mr. Connor was detained in federal custody for his charges from October 1, 2015 until October 27, 2015 and endured the harshness of this confinement without a visit from his family. He was released from the United States District Court in Worcester, Massachusetts and has been subjected to the strict conditions of pretrial release set by the Honorable David Hennessy.

      HOME INCARCERATION OF THE DEFENDANT AND HIS PRETRIAL RELEASE PHASE

In accordance with the conditions of his pretrial release, Mr. Connor was required to post a $10,000 secured bond, he has been subjected to home confinement, and has been required to be monitored electronically by GPS.  To this day, Mr. Connor has been restricted to the family home in Pennsylvania at all times except for mental health treatment and, until more recently, for the attendance of Sunday church services in his community, a request assented to by the government and allowed by the court.   Mr. Connor has been under home incarceration and GPS monitoring for over five months now and has been required to pay for the cost this monitoring and he has done so.   As a result of home incarceration, he had to withdraw from college and lost his part-time employment.  Mr. Connor has been ordered to, and did undergo a psychiatric evaluation and he signed releases to facilitate contact between the provider and the Probation Office.  Mr. Connor was also ordered to, and continues to participate in focused mental health treatment and he has used these several months to focus intently on the cause and prevention of his behavior toward the victim, and his overall betterment.

Mr. Connor was ordered not to access the internet or possess any computer or other devices capable of connecting to the internet and he has not.  Computers and other equipment were seized at the time of his arrest and ultimately forfeited due to his conviction.  His parents had to sign an affidavit that they would password protect their devices and remove them from the residence when they were not at home and there has been no internet access for him and no cell phone.  Prior to Mr. Connor being released, Mr. Connor's father removed his own hunting weapons, sold them and provided proof to the Probation Office.  Mr. Connor was ordered to report to Probation and Pretrial services as directed and his travel was restricted to Chester County, Pennsylvania, and Massachusetts for court hearings only. Finally, Mr. Connor was ordered to refrain from contact, directly or indirectly with the victim in this case, her friends, associates, or anyone known to the defendant through the victim and he has fully complied and he will continue to do so even after this case has ended.

      THE VICTIM IMPACT AND MR. CONNOR'S EFFORTS TO PREVENT SIMILAR FUTURE CONDUCT

Mr. Connor relates that the only girlfriend he ever had was the victim.  He has tremendous feelings of guilt for the trauma that he put on the victim and her family.  Mr. Connor is aware of the

significant impact his behavior has had on the victim through her statements and he deeply regrets his actions and wishes he could apologize to the victim personally although he knows that this is not allowed. He has learned and taken to heart that he put her in a constant state of fear and anxiety and made her feel that her security was threatened.  Mr. Connor is also aware that his behavior affected her ability to concentrate on her college studies and he hopes that she is able to finish all her course work and that any separation from the incidents continues to help heal the victim's emotional wounds.  If he could communicate his feeling of sorrow and remorse to the victim, Mr. Connor would express that he has no intention whatsoever of contacting her again directly or indirectly and that she should not live in fear of him.  Mr. Connor would explain to her that he has sought mental health counseling and will continue to undergo counseling for as long as it is necessary and that he has used his months of counseling and home confinement to educate himself on the dangers of his behavior and he has learned effective coping skills and continues to developed greater self-confidence so that he will never have a repeat of this conduct in a relationship with another person.

  Even before his arrest on October 1, 2015, Mr. Connor knew he had a problem with his mental state with respect to the rejection and his subsequent interactions with the victim.  In an unguarded moment in the weeks prior to his arrest, Mr.  initially sought mental health counseling on his own at Delaware County Professional Services on September 10, 2015.  There, he first sought help for the relationship break up, his feelings of devastation, anger, sadness and anxiousness.  At that time, individual psychotherapy was recommended to reduce depression symptoms, increase coping skills and provide support.  Unfortunately, Mr. Connor only had two treatments there prior to his arrest and he was suffering from being obsessively naive in love in his first relationship and this became an obsession for him.

  Since his arrest, Mr. Connor underwent a psychological evaluation per order of the court to discern his risk of harm to himself and to others.  His parents had to assist in this evaluation by providing a comprehensive history of information to his psychiatrist.   Based upon his entire evaluation and meetings with his psychiatrist, it was determined that Mr. Connor is at a low risk for sexual or nonsexual violence, his risk of self-harm is low, and any potential future risk in this regard can be contained or mitigated through the appropriate mental health treatment in the community.   There were specific recommendations that his psychiatrist made that Mr. Connor has diligently followed through on such as entering into individual therapy with a PHD licensed psychologist experienced with working with clients that have developed problematic relationships on the internet or through social media.  Mr. Connor's

medications have also been evaluated and monitored by his Pediatrician.  It was also recommended that Mr. Connor not use dating or similar sites on the Internet until his therapist deems it appropriate.

Since his release, Mr. Connor has been in focused individual mental health counseling and is extremely invested in his betterment and "making sure that this never happens again in any relationship" so that he possesses the skills necessary to effectively deal with issues surrounding rejection.  Mr. Connor has undergone this mental health treatment once per week with a licensed phycologist with Addiction and Psychological Therapy, Inc. located in West Chester, PA.  His therapist has also recommended that Mr. Connor participate in the support group for Sex and Love Addiction Anonymous and he has done so and feels that he benefits from these group meetings as a complement to his weekly mental health sessions with his current doctor.  He has read materials and reviewed a documentary and hopes one day that he may be an advocate against what he did.  Mr. Connor has learned acceptance and realized how normal break-ups are.  He sincerely wants this court to know that he has truly "learned my lesson from this."  Mr. Connor hopes that he may be able to take "the new skills I have obtained in therapy and enact them in a relationship with someone who accepts me for my past."

Lastly, in an abundant show of support, leaders and members of Mr. Connor's church have been doing a rotation of weekly visits to the Connor home during the time he has been under home confinement to meet with Mr. Connor and provide him with additional companionship, and fellowship.

MR. CONNOR'S BACKGROUND, CHARACTER, HISTORY AND COMMUNITY SUPPORT

Mr. Connor is the oldest of two children born to an intact, loving and supportive family and has enjoyed strong family ties has deep roots to his church and the community.   He is now twenty years old. He had a normal and active childhood and socialized well with others.  He was involved in extracurricular activities in high school and was active in the marching band, sang, and played musical instruments.  He has no criminal record and has been a lifelong resident of West Chester, PA.  Mr. Connor graduated from West Chester East High School.  Until his arrest, he was enrolled Delaware County Community College as a sophomore majoring in business.  He was a Dean's List student and received an Academic Gold Award for scholastic achievement during the 2014-2015 academic year (See Attachment).  At the time, he was also maintaining part-time employment at a pharmacy, where he had been promoted to Shift Supervisor.  He also had prior employment with a drug store and even worked over the summer at his father's company as a mechanical assembler.  Mr. Connor has been active in the choir at his church for years and has been a member of the "Praise Team" and has helped add to the church experience by playing musical instruments and singing.   He has cherished the opportunity to

attend church with the permission of the court during his home confinement and he has benefitted from being able to worship and "receive support and mentoring from a Christian community that knows JC well." I referenced part of a letter submitted by his pastor, the Rev. Christopher J. Franz of the Advent Lutheran Church. There are many letters of support that have been forwarded to the court for consideration. First, and foremost, each of Mr. Connor's supporters is fully aware of the serious nature of his crime, and each acknowledges that there must be punishment for committing this crime. Yet, each person asks this Court to consider the goodness of this young man and the good works he has performed throughout his life and how he has lived up to this point when considering an appropriate punishment.

As a teacher, coach and administrator for 50 years, Norton Seaman, the retired principal of the Lower Merion School District wrote that he has known Mr. Connor for 10 year as a member of his Sunday School class and also as a member of the their church. He spoke of Mr. Connor's talented contributions to the "Music Ministry with his voice, trumpet and guitar" in both his class and at his high school. He knows Mr. Connor as "an extremely kind, considerate and loving young man."

Pastor Franz cares so much for James Connor and believes in his goodness, he actually wrote two letters to the Court. He relates information about the Connor family being very active in the church and sharing their gifts of music. He notes Mr. Connor was a member of the praise team and he served as a youth group member and youth chaperone prior to this legal trouble. He has observed over the years that Mr. Connor has a very strong faith and that he is "convinced that his demeanor and character are such that he would never have followed through with the actions he threatened."

P.J. Baer-McGrath is another member of the Advent Lutheran church who took the time to write to the Court and explain that she has known Mr. Connor and his entire family for twenty years and her children and the Connor children have spent a great deal of time in each other's company via the youth group and other activities. Her personal experience with Mr. Connor "have demonstrated that he is a fine young man who is actively involved in his spiritual life and development." She also relates the musical talents of Mr. Connor and how they have demonstrated his passion and purpose at the church and "the congregation has bas benefitted greatly from his efforts." She knows Mr. Connor as gentle young man who has been thoughtful, well-mannered and kind-hearted.

Mr. David M. Offutt has been in close contact with James Connor since he was in grade school and knows him due to his involvement in music groups at the Advent Church where he also served as Council Vice President. Acknowledging the seriousness of the charges, he writes, "in all of the behavior I have ever observed, James has always exhibited respect, kindness and decency [to] those around him,

regardless of age or sex." He describes Mr. Connor as someone who is cheerful and willing to help others. He has indicated that the behavior is "totally out of character for the young man we know."

Eleven people that know James Connor from his past employment at a pharmacy signed a group letter to the Court and explain in it that they know him as a person that "has shown respect for his coworkers and our customers." They have observed Mr. Connor as a person "with a willingness to help, do his job right and to be calm under pressure . . . which has been refreshing for everyone at our store."

Mr. Joshua Arthur Worrell, a fellow student, church goer, and friend of Mr. Connor since they attended middle school together describes "the pleasure of knowing James as a friend." He saw, first hand, Mr. Connor's "devotion to his faith" and describes his commitment to their church. He knows James as "a selfless individual who would do anything in his power to help you out."

Ms. Cheryl A. Worrell has known Mr. Connor since he was six years old, both as a fellow church member then as a co-worker at their pharmacy job. She writes that "James has always shown respect, concern and willingness to help others," especially older customers at his job. She also writes about his involvement in the youth group, which has gone into impoverished neighborhoods in different states to help build up and clean up homes.

Ms. Margaret Schimied, the Advent Lutheran Church Administrator has known "J.C." as "a very important member of the ministry at Advent." As a mother of four grown children herself, she realizes young people do not always make the right choices but with love, guidance patience and the support of members and friends they can turn into responsible spouses and parents. She states that "J.C. has this type of love and support [in his own family and community] and even though his judgment in his relationship with this young woman was severely impaired, I believe there was a deep-rooted reason for this that he is trying to come to terms with through counseling and other means of self-evaluation."

All letters of support for Mr. Connor have been attached.

<u>THE COLLATERAL CONSEQUENCES OF THE MISCONDUCT AND OUR PROPOSED SENTENCE</u>

Mr. Connor has been under home confinement since October 27, 2016 with strict conditions prior to his guilty plea and pending sentencing. His life as a twenty year old young man has been put on hold and has been significantly hampered. He is now a convicted felon for Cyberstalking and Extortion. He realizes that he has made a colossal error in judgment, an error that he will pay for the rest of his life. As a result of his conviction, he cannot vote and will be disqualified from jury service for a period of time and may realize great difficulty finding employment or being suitable for certain gainful employment. In addition, Mr. Connor, an aspiring business major in college prior to his arrest, will find it difficult to obtain student loans and grants due to his convictions which may impact his educational goals.

      Mr. Connor respectfully requests that this court impose the sentence as outlined above. Section 3553(a)(2) provides for consideration of four factors in imposing a sentence. The first two factors to be considered under § 3553 (a) is just punishment and adequate deterrence to criminal conduct. In imposing just punishment and crafting an adequate deterrence, this Court should consider Mr. Connor's background, character, and history, motives, and the nature of his conduct. Mr. Connor grew up in a normal household and had been taking advantage of educational, employment and community activities until the time of his arrest. He graduated from high school and was working part-time and going to college. He had never been in legal trouble before. He is very active in his church and community where he is known as a kind, gentle and giving young man. He was in his first romantic relationship at a young age and now he has come to the self-realization that he was ill-equipped, insecure, suffering from very low self-esteem, and unable to deal with the ending of the relationship which resulted in his conviction. Although Mr. Connor threatened to do many horrible things to the victim, he never followed through with any of the things he said he would do. His actions resulted in emotional harm to the victim, but he never disseminated any nude material and he never perpetrated physical harm to anyone. To this point, Mr. Connor has already suffered significantly in terms of his freedom, his employment and his education goals which have all been put on hold. He spent twenty-seven days in federal detention separated from his family and his home state. He has endured home confinement with GPS monitoring for over five months. In addition to four more months of home confinement with GPS monitoring, two years of probation, 150 hours of community service, and no contact with the victim and others, would all serve to provide just punishment for the offenses and afford adequate deterrence for Mr. Connor to any criminal conduct.

      The remaining factors of protecting the public from further crimes of the defendant are addressed in the evaluation and treatment that was ordered and the mental health counseling and group meetings that Mr. Connor has undergone and attended and would continue to attend in accordance with the Court's sentence to make sure that Mr. Connor remains a mentally healthy

individual capable of dealing with all his future relationships.  The ends of justice would be served by such a specific sentence and based upon the foregoing argument the defendant, James Connor, respectfully requests that this Honorable Court adopt this proposed sentence.

                                                Respectfully submitted,

                                                JAMES FRANCIS CONNOR V,

                                                By his lawyer,

                                                /s/ Patrick J. Murphy_____

                                                **Patrick J. Murphy, Esq.**
                                                **BBO# 566206/ pmurphy.esq@gmail.com**
                                                170 Milk Street, Fourth Floor
                                                Boston, MA 02109

DATED:  March 30, 2016                  617-367-0450

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

      v.                CASE NO. 15-mj-4342-DHH

JAMES FRANCIS CONNOR V
_____
       Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2016 a copy of Defendant's Sentencing Memorandum with attachments was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the
Court's CM/ECF System.


/s/ Patrick J. Murphy
Patrick J. Murphy, Esq.
170 Milk Street, Fourth Floor
Boston, MA 02109
Phone: 617-367-0450
Fax: 617-275-8000
Email: pmurphy.esq@gmail.com
BBO#566206